GUERRA *v.* THE TREASURER OF PORTO RICO.

APPEAL from the District Court of San Juan.

No. 45.—Decided April 7, 1905.

TAXES—BOARD OF REVIEW AND EQUALIZATION.—The Internal Revenue Law authorizes appeals from the valuation of property by assessors to the Board of Review and Equalization which has authority to decide all claims made by taxpayers in connection with the valuation of their property and to raise or lower the valuation contained in the schedules whether or not a complaint has been made in relation thereto.

ID.—DECISION OF THE BOARD.—The decision of the board in all questions properly coming before it for consideration shall be final, and no appeal shall be allowed from its decisions to the Executive Council.

ID.—GENERAL POWERS OF THE BOARD.—The intention of the Legislature when it created the Board of Review and Equalization was to give it general supervision over the levying of taxes, and it is not necessary that there should be an express provision denying the right to the taxpayer to appeal to the courts of justice, as the general repealing clause is sufficient for that purpose.

ID.—NEW SYSTEM OF TAXATION—LAW OF AGRICULTURAL COLONIES.—When the legislature enacted the Law of Internal Revenue it established a new system of taxation, repealed all former systems, made the exemptions it thought fit, revoked and annulled those exemptions which were not expressly left in force and thereby swept away the privileges granted by the Law of Agricultural Colonies in taxation matters.

ID.—CONTENTIOUS-ADMINISTRATIVE PROCEEDING.—To avail himself of the contentious-administrative proceeding, the party must first exhaust all governmental appeals, and if demand for a decrease is made to and is denied by the Treasurer, an appeal from his decision lies to the Board of Review and Equalization before resort can be had to the proceeding known as contentious-administrative.

ID.—JURISDICTION OF THE PERSON AND OF THE SUBJECT MATTER.—Jurisdiction of the person is presumed when there is nothing to the contrary in the record,

but jurisdiction of the subject matter is never presumed, and cannot be conferred by consent of the parties.

ID.—DILATORY EXCEPTION.—The contentious-administrative proceeding authorizes the filing of dilatory exceptions, and among them is the one which refers to the jurisdiction of the court, which exceptions may be presented before the answer, or at the same time, but the court must decide them before trying the case on the merits.

ID.—JURISDICTION OF THE COURT IN CONTENTIOUS-ADMINISTRATIVE ACTIONS.— The exhaustion of governmental remedies is an indispensable prerequisite to give the court jurisdiction in contentious-administrative actions.

ID.—VOLUNTARY PAYMENT OF TAXES.—The payment of taxes by a taxpayer who is not under duress either as to his person or his property should be considered voluntary.

ID.—COLLECTION OF ILLEGAL TAXES.—So that the taxpayer may protect his rights or recover amounts paid for taxes illegally assessed against his property, he should wait before making the payment until the moment when he sees himself threatened with a sale of his property, and then make the payment under protest, or take the necessary measures to prevent the sale.

ID.—RECOVERY OF SUMS PAID FOR TAXES ILLEGALLY IMPOSED.—The sums which voluntarily or inadvertently and without protest of any kind, have been paid to the Treasurer as taxes and under a mistaken claim of right, cannot be recovered in judicial proceedings but by action of the legislature.

ID.—TREATY OF PARIS—PROPERTY BELONGING TO PRIVATE PERSONS.—Article XIII of the Treaty of Paris refers only to real property belonging to the Crown of Spain, the ceding of which to the American Government cannot affect the rights of private persons, and that article has no application to private property nor to the privileges granted by the Law of Agricultural Colonies in taxation matters.

ID.—CASES IN WHICH THE REDUCTION OR EXEMTION OF TAXES CONSTITUTES A CONTRACT.—So that the reduction of or exemption from taxation granted by the State shall have the nature of a contract and not be affected by later legislation, it is necessary that there should be a consideration, as in any other contract; that is, that the taxpayer be obligated to do something, or else that he has already done something, in benefit of the State, otherwise the concession is reduced to a *nudum pactum.*

ID.—CONSIDERATION.—By consideration is understood, for the purpose of determining the existence of a contract, the benefit or benefits which one party receives from the other, or the latter obligates himself to confer upon the former, and to which he had previously no right; or also, the damages which one party suffers because of the other, and which he was not obliged to suffer, the existence of the said benefits or damages being the reason which caused the other party to obligate himself.

ID.—PRIVILEGES GRANTED BY THE LAW OF AGRICULTURAL COLONIES.—The reduction or exemption of taxes granted by the Spanish Government in conformity with the Law of Agricultural Colonies, does not constitute a contract, because of want of a consideration, which is a material element, and therefore the exemption may be modified or abrogated by the Legislature, as in fact the said Law of Agricultural Colonies has been repealed by the Revenue Law of 1901.

The facts are stated in the opinion.

*Mr. del Toro, Fiscal,* for appellant.

*Mr. Sarmiento,* for respondents.

MR. JUSTICE MACLEARY delivered the opinion of the court.

This case presents an appeal interposed by the Honorable Attorney-General of Porto Rico against a judgment of the District Court of San Juan, rendered on the 17th of June, 1904, in a "contentious-administrative" case instituted by Mauricio Guerra and Arturo Guerra against a resolution of the Treasurer of Porto Rico upon the effect of concessions claimed to have been made under the Law of Agricultural Colonies to them in regard to the plantation called "Blandito."

Under the Spanish government the Messrs. Guerra enjoyed a reduction of taxes upon their plantation known as "Blandito," by virtue of a law enacted in Spain on the third of June, 1868, and afterwards extended to several of the colonies, and among others to Porto Rico. This law was continued in force under the American occupation until the passage of the Revenue Act of the 31st of January, 1901, commonly known as the Hollander Law, which repealed, or attempted to repeal, all other laws concerning taxes upon real estate and other taxes in Porto Rico, and substituted an entirely new system of taxation constructed on the American plan. Under the Hollander Law the plantation "Blandito" was taxed in the same manner as other lands in Porto Rico, but before the law took effect, on the 1st of July, 1901, Mauricio and Arturo Guerra presented a petition to the Treasurer requesting that their taxes upon this sugar plantation be continued as before at thirty-one *pesos* annually, amounting to eighteen dollars and sixty cents in American money.

The Treasurer of Porto Rico, Hon. W. F. Willoughby, took the opinion of the Attorney-General upon the matter, and he was advised that the plantation "Blandito" was subject to taxation as other lands, and that the Hollander Law had re-

pealed the benefits of the law applying to agricultural colonies under which the reduction was claimed. The resolution of the Treasurer may be stated substantially in the language of the opinion rendered by the Attorney-General's office on the 11th of December, 1901, which reads as follows:

"It seems to me that these property owners, who claim that their lands are exempted from tax under a Spanish statute, have been guilty of such laches as deprive them of administrative recognition of their exemption. Under the Revenue Law they had an appeal to the Board of Review and from there to the Executive Council, and in this way they would have the question as to the propriety of the assessment settled authoritatively. To the argument that such proceeding is for the review of the assessment *in toto,* it is a sufficient answer to say that this confirms the position that it was the intention of the Revenue Law to establish a uniform system of taxation, that all property should be assessed, and that no exemption should be recognized. From an administrative standpoint the Revenue Law must be so construed, particularly in view of the language of sections 1 and 2 of the law. Section 1 provides for a tax of one-half of 1 per cent upon all real and personal property. Section 2 says all property not expressly exempted shall be subject to taxation, as herein provided. Section 3 contains the expressed exemptions last referred to. Subdivision B, under section 3, specifies property exempted from taxation by the laws of the United States. No other exemption specified in section 3 will cover the case of Messrs. Guerra.

"The exemption which is claimed under sections 7 and 8 of the Spanish *'Ley de Colonias'* was not one in the form of a contract made by the State with its citizens, but was in the nature of a special privilege or indulgence. The sovereignty which gave could take away, both by repealing the statute of special favor and by stopping the continuance of the specific favor already granted. That prerogative of sovereignty passed to the Legislature of Porto Rico. The Treaty of Paris, article 8, says that the 'relinquishment or cession, as the case may be, shall not in any respect impair the property or right which by law belongs to peaceful possession of property of all kinds, of a province, etc., or of a private individual.' This refers, however, to the cession by Spain to the United States of public domain and the Crown properties; it does not recognize either as a property or as right of property a mere grant of exemption from taxation for a term

of years. The exemption granted by sections 7 and 8 of the *'Ley de Colonias'* is in conflict with the intention on the part of the Legislature of Porto Rico to tax all property not expressly exempted in section 3 of the act, and those sections therefore come under the operation of section 111, which repeals all conflicting acts, laws, decrees, ordinances, etc.

"The officials charged with the administration of this Revenue Law must execute it with reference to the properties, extending the tax in due time, which will constitute a lien on the property if not paid. Messrs. Guerra may then assert their exemption by means of the judicial remedies which are open to them"

Under the laws of Porto Rico then in force the taxpayers, instead of pursuing the remedy suggested in the last paragraph of the opinion from the Attorney-General's office, availed themselves of what is known as the *"Contencioso-Administrativo"* procedure and removed the question thereunder to the District Court of San Juan, where, on the 16th of January, 1904, a judgment was rendered in their favor. The petition of the plaintiffs, prosecuting their case in the District Court of San Juan, states their claim substantially as follows:

"Messrs. Mauricio Guerra and Arturo Guerra, owners of the said estate, applied to the Hon. Treasurer of this Island on the 8th of May 1901, setting forth that since the 18th of August of the year 1896 the benefits of Articles 7 and 8 of the Law of Agricultural Colonies had been granted to the said plantation, or that during ten years, counting from the said date, they should pay as territorial taxes only the sum which up to that time they had paid, or 31 *pesos*, provincial currency, annually, equivalent to $18.60, as was communicated by the central administration of taxes and revenues of the office of the Mayor of Vega Baja in an official communication dated the 11th of March, 1898; that notwithstanding the change of sovereignty in this Island, that tax was not altered on account of the privilege being respected in accordance with article 8 of the Treaty of Paris. And that, notwithstanding this, the assessor for the district of Vega Baja had assessed the valuation of the estate of the plaintiffs, to impose taxes upon it in accordance with the so-called Hollander Law, for which reason they made application to the honorable Treasurer, petitioning him to order that their concession be respected, as had been

done up to that time, in spite of the fact that during the military government of General Henry the system of taxation had been changed, that system being established of which Dr. Coll y Toste was the author. In the said writing and another one which they presented on the 20th of August of the same year, 1901, the petitioners also stated that when they acquired the estate, in 1895, it was completely abandoned and had not been under cultivation for more than fifteen years, while on the date of their petitions 250 *cuerdas* of cane had been planted thereon, which was soon increased to 300, for which it had been necessary to spend large sums of money in draining swamps and marshy land and cutting down brush and undergrowth, and other extraordinary labor, which only under the benefits granted them by the Law of Agricultural Colonies would they have decided to undertake; that the said law was passed, not with a view to providing the Treasury of Porto Rico with revenues, but to encourage the cultivation of its lands, which would have remained unproductive if it had not been for that wise and generous law; that in granting to the owners of those lands the privilege of paying a low tax during a certain number of years also benefited the public treasury, since on the expiration of the time it would have rich lands which would contribute largely to the payment of public expenses; and, finally, that the 111th section of the law to provide revenues for The People of Porto Rico, in repealing, as it did repeal, all other laws in conflict with the same, referred only to those which established other systems of taxation, prior to the promulgation of the Hollander Law, with the same object as that of the latter, but not the Law of Agricultural Colonies, which was not passed with this object in view, but with a view to encouraging the cultivation and agricultural development of the Island, and has not been repealed, but continues in force.

"On the 9th of December of said year 1901 the Messrs. Guerra again applied to the honorable Treasurer, petitioning him to communicate to them the action taken on their former writings, and then on the 11th of the said month of December, 1901, the decision was given, which, in accordance with the opinion of the Acting Attorney-General, denied the claim of the Messrs. Guerra, on the following grounds: 1st. On account of the petitioners having been negligent in not applying in due time to the Committee on Revision and to the Executive Council as they could have done, in accordance with the Internal Revenue Law, in which case it could have been determined whether or not it was proper to assess the estate; second, because the spirit of the said Revenue Law had been and was to establish a system

of taxation which would be uniform in so far that all property should be assessed without acknowledging any exception whatever; third, because, in accordance with sections 1 and 2 of the said law, all property not expressly exempted is subject to taxation, and among the express exemptions provided for in its third section, none of them include the case of Messrs. Guerra; fourth, because the sovereignty which gave the privilege could have taken it away, suspending the continuation of the special favor granted; and because that prerogative of the Government passed to the Legislature of Porto Rico by reason of the change of sovereignty which occurred in this Island; fifth, because, although article 8 of the Treaty of Paris respected the property and the rights of all classes relating thereto corresponding to a province or to a private individual, this only referring to the properties of the public domain and of the Crown, it was not applicable to an exemption from the payment of taxes during a certain time; and, sixth, because the exemptions granted by sections 7 and 8 of the Law of Agricultural Colonies is in conflict with the intention of the Revenue Law to impose taxation on all property not expressly exempted by the same, it being evident, therefore, that it comes under the operation of its section 111, which repeals all laws and orders in conflict with the Revenue Law.

"The said administrative decision concludes by stating that Messrs. Guerra could assert their exemption by means of judicial remedies which were open to them, and therefore, on the 21st of February of the year last passed, Messrs. Guerra applied to this court, sending therewith a copy of the communication of the general Government of the Island, dated 18th of August, 1896, in regard to the concession of the benefit of the Law of Agricultural Colonies, and the original communication from the Treasurer, denying their claim, as well as the translation of the said communication, duly taking the 'contentious-administrative' appeal against the decision violating a pre-existing right, and praying that the appeal be admitted, and that the record be ordered produced by the Administration.

"On the 21st of February that request was granted, the administrative record being ordered to be sent up, and with a writing of the 5th of April Messrs. Guerra presented two receipts, dated 10th of March of the same year, showing the payment corresponding to the second quarter of the fiscal year 1901-1902 of the territorial taxes, amounting to $50.79, and an equal amount for the municipal taxes, which receipts were ordered attached to the records on the same date. On the 19th of June the administrative records ordered to be sent

were received, the same were ordered to be referred, with the other matters pertaining thereto, to the appellants, in order that they might formulate their complaint within twenty days, which time was extended ten days, within which time the said complaint was presented by their attorney, Don Hilario Cuevillas, basing the same on certain facts set out at length.''

The *fiscal* in the district court first filed a demurrer to the complaint, which was considered by the court and overruled. Answer was then made setting out the defense along the lines indicated in the opinion of the Acting Attorney-General. Proof was taken and may be said to establish the essential facts alleged by the taxpayer without justifying the legal conclusions advanced by them as flowing therefrom. Some of the points made by the counsel for the government were not noticed by the trial court having probably been disposed of in the order overruling the demurrer, and do not appear to have been decided in the judgment rendered.

For a better understanding of the case this judgment will be quoted at length. It reads as follows:

"In the city of San Juan, Porto Rico, on the 16th day of January, 1904, this 'contentious-administrative' appeal, prosecuted by Arturo and Mauricio Guerra, through their attorney, Hilario Cuevillas, Esq., and on the trial being represented by Don Antonio Sarmiento, against a resolution of the Treasurer of Porto Rico, under date of December 11, 1901, and one refusing to grant the petition of the plaintiffs herein, which was that the benefits granted to them by the Law of the Agricultural Colonies enacted by the Government of Spain for this Island during the Spanish sovereignty, continue to apply with reference to their property known as 'Blandito.'

"1. Finding: That the lawyer, Hilario Cuevillas, in the name of Mauricio Guerra and Arturo Guerra, in due form and time took an appeal (*contencioso-administrativo*) from the resolution of the administration on the ground that the said administration refused to recognize the benefits conferred upon his clients by the Law of Agricultural Colonies, under which they had cultivated and reclaimed an estate, property belonging to them, known as 'Blandito,' situated in the jurisdiction of Vega Baja, composed of 367 hectares, three

ares, of which 87 hectares and 50 ares were abandoned, swampy and marshy land, and the remaining 268 hectares, 94 ares and 5 centares, was composed of land which had not been cultivated for more than fifteen years.

"2. Finding: That the record of the administrative proceedings was requested from the proper authority, and the same having been received, the appellants were heard in regard to other matters in order that, within the period of thirty days which term might be extended ten days, the corresponding 'contentious-administrative' complaint might be presented, at the expiration of which time the lawyer, Mr. Cuevillas, presented the same in the name of the appellants, basing the same on the following facts: That his clients were the owners of the estate 'Blandito,' containing 377 hectares and 3 ares, situated in the jurisdiction of Vega Baja; that of the said tract of land 87 hectares, 50 ares and 5 centares were marshy land and swamps, and the rest of the estate was composed of land which had not been cultivated for more than fifteen years; that his clients took advantage of the Law of Agricultural Colonies, in force in Porto Rico in 1883, as otherwise it would have been impossible to cultivate and make the property productive, and the proper procedure having been followed, the decree which accompanies the complaint was issued, granting his clients the right extended by the Law of Agricultural Colonies, to which reference has already been made; that in view of the same Messrs. Guerra have been cultivating the property under the decree referred to; that in order to compel respect to their rights they made application to the General Treasury, which, after having gone through various formalities, made the resolution from which this appeal is taken, which resolution was communicated to the interested parties on the 11th of December, 1901; that from this resolution which violates a pre-existing right, a 'contentious-administrative' appeal was taken against the administration, which was admitted by order dated 21st of February, 1902; that accompanying a writing of the 5th of April of the same year, they sent two receipts covering payments of taxes, without prejudice to their rights to protest against the collection of the same; that after the change of sovereignty the right granted the owners of the estate 'Blandito' was respected as appears from a document and various receipts for taxes which accompanied the same; that in making up the list for the payment of the Hollander tax, in the column for remarks, the benefit which the said estate enjoyed under the Law of Agricultural Colonies granted by the Spanish Government, was made to appear, in

spite of which fact the assessor assessed the property, alleging that
it was not within his jurisdiction to take cognizance of matters of
this nature; for which reasons the Treasurer was appealed to, who
in turn referred the matter to the Attorney-General, who denied
the petition; that the estate 'Blandito' is completely drained and re-
claimed, which has been accomplished after much expenditure of
money and sacrifices, which never would have been done except for
the existence of the Law of Agricultural Colonies, and if it had not
been believed certainly that the rights granted under the same would
be permanent and stable; that when General Henry changed the
system of taxation in this island the rights of the owners of the es-
tate 'Blandito' were respected, under which system of taxation $1
per *cuerda* for land of the first class, per annum, 50 cents per *cuerda*
for land of the second class, and 25 cents per *cuerda* on land of the
third class was collected, but notwithstanding this, the estate 'Blan-
dito' continued to pay the same tax of 31 *pesos*, provincial currency,
to the estate in accordance with the collection made and the pro-
visions of the Law of Agricultural Colonies; and finally that he in-
stituted the 'contentious-administrative' action within the period of
time allowed for the same; praying that after to the proper legal
proceedings the suit be declared well founded, and that the Ad-
ministration be ordered to respect the concession to the owners of
the estate 'Blandito,' repaying them for the taxes unduly collected
and declare null the resolution of the Treasurer General of Porto
Rico of the 11th of December, 1901, from which this appeal is taken,
and requesting a further prayer that the record in the case be ad-
mitted in evidence.

"3. Finding: That the complaint being admitted the Administra-
tion was notified, and in its name the Attorney-General, in order
that reply might be made within twenty days, and before answering
the complaint he presented a demurrer alleging that the said com-
plaint did not show with sufficient clearness the claim of the plain-
tiffs, as required by articles 42 and 46 of the Law of 'Contentious-Ad-
ministrative' matters, which demurrer after having been duly heard
was overruled by judgment of the 15th of April, 1903.

"4. Finding: That another term of fifteen days having been
allowed for answer to the complaint, the same was made by the
Assistant Attorney-General, setting forth the following facts; that
on the 8th of May, 1901, Messrs. Mauricio and Arturo Guerra di-
rected to the Treasurer of Porto Rico a writing giving the history
of the estate in question, stating that the same, on the date of the

concession, was composed of unproductive marshes and swamps, and that now it is composed of good land, 300 *cuerdas* of the same being composed of cane plantation, and finally petitioning that the Administration should compel them to pay only $18.60 as taxes until the year 1906; the said writing was referred by the Treasury to the office of the Attorney-General, from whence it was returned duly reported upon; that the Treasurer decided on the matter and advised the interested parties, in effect in accordance with the report of the office of the Attorney-General, concluding by denying the petition presented by the plaintiffs, to which reference has already been made; and that from the said decision of the Treasury Messrs. Guerra duly took a 'contentious-administrative' appeal, concluding by praying that after the necessary proceedings the complaint be dismissed, acquitting the Administration and deciding that the complainants are obliged to pay on the estate 'Blandito' the taxes required by the law of the Legislative Assembly, approved on the 31st of January, 1902, which clearly repeals the Law of Agricultural Colonies, upon which the appellants base their claim.

"5. Finding: That the complainants having prayed that the trial of this cause be begun and opened to evidence, the prayer was granted fixing a term of ten days, which was not to be extended, for the introduction of all pertinent evidence, and the term of twenty days in which to answer such evidence as might be presented.

"6. Finding: That the complainant introduced as written evidence the following: A copy of the resolution of the Governor General of the Island of Porto Rico, under date of the 18th of August, 1896, in which the concession granting to Messrs. Mauricio and Arturo Guerra the benefits of the Law of Agricultural Colonies, on the estate 'Blandito,' which original communication also came into the record in this case; a resolution of the Treasurer of Porto Rico denying the petition of the plaintiffs to recognize the benefits enjoyed with reference to the estate 'Blandito,' which resolution is dated 11th of December, 1901; a certificate issued by the office of the mayor of Vega Baja in regard to various matters concerning 'Blandito,' dated 22d of May, 1903, the authenticity of which was certified to in due time; another certificate issued by the same office of the mayor, showing that the following documents were to be found on file in the said office; a communication from the Governor General of the Island of Porto Rico, Secretary's Office, Department 3d, under date of 30th July, 1896; another certificate from the Central Administration of Taxes and Revenues of Porto Rico of the 11th of March,

1899, reducing the rate of taxes on the estate 'Blandito' to the rate of 31 *pesos;* another certificate issued by the said office of the mayor showing that the said estate 'Blandito' paid during the fiscal years 1899-1900 and 1900-1901 the rate of eighteen dollars and sixty cents as municipal taxes; and finally a communication No. 1966 from the Central Administration of Taxes and Revenues of Porto Rico, dated 11th of May, 1897, which ordered that during the first three months of that fiscal year the owners of the estate 'Blandito' should pay the rate fixed by the board of experts, and during the following three months the tax corresponding to the 31 *pesos* fixed in the foregoing fiscal year.

"7. Finding: That oral testimony was also proposed, and on the citation of the parties, the witnesses Messrs. Guillermo Rubert, Tulio Otero, Pedro Brüll, and Tomás Prado Landrón, testified without being qualified to do so, in accordance with the interrogatories presented and declared pertinent; that they knew to be true that Mr. Arturo Guerra, in the month of July, 1897, delivered at the sugar central 'San Vicente' for the first time, to be ground, 18,000 hundred-weight of cane, necessarily planted in the year 1896; that during the first two months of the year 1901 he delivered with the same object 89,770 hundred-weight, which cane was planted at the latest in July, 1900, on 250 or 300 *cuerdas* of land; that the production already mentioned has not been exceeded by the crops of 1902 and 1903; that since 1906 the lands of the estate 'Blandito' have been in process of being reclaimed and drained, there existing at present 300 *cuerdas* under cultivation in cane and the balance used for pasturing cattle; that in order to obtain such results on the estate continuous expenditures have been made by the owners, the Messrs. Guerra; that on account of such industry not only the owners may have been benefited, but also the public sanitary condition, in view of the fact that several pestilent nuisances have been removed which threatened seriously the public health, and that without the concession granted by the Law of Agricultural Colonies it would have been impossible to put the estate 'Blandito' in the condition it is now found.

"8. Finding: That the evidence of ocular inspection having been given, and the notes made, without the objection of the parties to anything relating thereto and all the evidence proposed having been presented, a day was set for the hearing, on which occasion the attorneys for the parties made such allegations as they deemed pertinent

to their rights, the record being declared closed for the entering of judgment.

"9. Finding: That in this case the rules of procedure have been duly followed.

"The Associate Judge Don José Tous Soto delivered the opinion of the court.

"1. Concluding: That it must be admitted as a fact beyond any doubt whatever that the benefits claimed by plaintiffs were granted to them; to pay on the estate 'Blandito,' in the municipal jurisdiction of Vega Baja, ward of Cabo Caribe, during ten years, beginning with the year one thousand eight hundred and ninety-six, the sum of thirty-one *pesos* provincial money, or eighteen dollars and sixty cents, on account of the application to the same of the privileges conferred under the Law of Agricultural Colonies, of the third of June, one thousand eight hundred and sixty-eight, applied to this Island by Royal Decree of the fourth of May, one thousand eight hundred and ninety-four, not only because the Administration has not denied this fact in its answer, but because the official communication brought into the record by the complainants, shows clearly that the concession was really granted to them in the manner set forth.

"2. Concluding: That the concession granted to an estate, the benefits of the Law of Agricultural Colonies, established a contract between the Administration and the grantee, by which the Administration exempts the planter from the payment, partial or total, of taxes, in compensation for the service which such planter renders to the community by putting in cultivation unproductive and insalubrious lands; or what is the same, a real lease of service, in which the State as lessor pays as a favor the imposts which it does not collect from the lessee who renders service in reclaiming and cultivating lands.

"3. Concluding: That on such a supposition the contract entered into between the State and the property holder, similar to that established between a corporation incorporated with a clause of exemption from the payment of imposts and the State incorporating the same, must be respected and complied with by both parties to the contract, and therefore by The People of Porto Rico, subrogated by virtue of the Treaty of Paris and of the Act of Congress of 12th of April, 1900 (Foraker Law), in the rights and duties of the former *Administración Provincial,* or general Government of the Island.

"4. Concluding: That the judgment of the Supreme Court of the United States, cited by the defendant, is applicable only in the part

that states: 'The incorporation of a company with a special charter exempting its lands and other properties from taxation, creates by virtue of the acceptance of the charter or clauses of incorporation, a contract which guarantees the company the exemption from taxation during the period specified in such charter on account of the similarity which this case has with the one of the concessions of the benefits to agricultural colonies by virtue of a petition of the interested party, equivalent to the charter of incorporation; but it is not applicable with reference to other points, since the exemption from taxes for the term of ten years granted by the Legislature of the District of Columbia (26th of June, 1873) of all property, real or personal, not less in value than fifty thousand dollars, employed on the date of the promulgation of the law, (be actually employed) for manufacturing purposes, has no similarity to the exemption granted by the Law of Agricultural Colonies, inasmuch as exemptions from taxation made by law, in some cases specifying the time, and in other cases not, are merely concessions granted by the Law of Agricultural Colonies, revocable at the will of the same, without the establishment between the States and the grantees of any contractual obligation whatever, on account of the non-existence of concurrent wishes for the reciprocal compliance with agreements liberally stipulated, between the subjects of ample rights, nor therefore the judicial tie which constitutes a contract which cannot be broken nor untied, except for the causes bringing about the nullity or rescission of obligations.

"5. Concluding: That the express repeal of the Law of Agricultural Colonies by sections 1, 2, 3 and 111 of the Law 'to Provide Revenues for The People of Porto Rico,' of the 31st of January, 1901, cannot touch, in its repealing effects, the rights acquired under the repealed law, in accordance with Article 3 of the Civil Code of 1899 and Article 3 of the present Civil Code.

"6. Concluding: That in view of the foregoing, this 'contentious-administrative' remedy should apply, making its effect retroactive to the date on which the administrative reclamation was made; therefore, to the plaintiffs should be returned the excess on the taxes collected over the sum which they were obliged to pay.

"In view of the legal provisions cited, and those applicable under the law of contentious-administrative and the rule for the execution thereof:

"We adjudge: That declaring this 'contentious-administrative' remedy applicable, we should revoke and do revoke, the administra-

tive resolution against which this claim is made, and we should condemn, as we do condemn, the Administration to acknowledge that the estate 'Blandito,' situated in the ward of Cabo Caribe, of the jurisdiction of Vega Baja, property of Mr. Arturo Guerra and Mauricio Guerra, enjoys the benefit of the Law of Agricultural Colonies, consisting in the payment, during the term of ten years, counting from one thousand eight hundred and ninety-six of the sum of eighteen dollars and sixty cents as taxes and to return the amounts collected on the said estate in excess of the said sum, imposing the costs against the same (the Government) and this judgment being final, let a copy of the same, together with the administrative record, be returned to its origin.''

The Insular Government having lost the suit in the district court, the Attorney-General, on the 18th of February, 1904, brought the case here by appeal.

The case was argued in this court by Mr. A. Sarmiento on behalf of the taxpayers and by Mr. Jesús María Rossy the *fiscal* of this court, in behalf of the Government.

Counsel for the Government presents for the consideration of the court arguments which may be condensed and stated, in other words, substantially as follows:

''1. That an appeal by the taxpayers lay to the board of revision, created by the Revenue Law, and thence to the Executive Council; and that the petitioners in this case not having sought that remedy are cut off from this 'contentious-administrative' review.

''2. That the plaintiffs, having paid the taxes without protest or voluntarily, cannot now complain to the courts in order to recover back the money paid and to avoid future payments.

''3. That there is no authority in the 'contentious-administrative' law for imposing the costs upon the Government.

''4. That the exemption from taxation for a part of the land and the reduced valuation for the remainder, and the consequent very light tax imposed thereon, claimed under the law for agricultural colonies, cannot be sustained in view of the repealing sections of the Revenue Law enacted in Porto Rico on the 31st of January, 1901, commonly called the Hollander Law.''

In reply to the first of these several propositions advanced by the *fiscal,* the attorney for the taxpayers alleges that in none of the sections of the Revenue Law of Porto Rico is it enacted that the right to make a judicial claim against taxation or valuation made by the Treasury Department of the Island shall be lost through failure to use administrative remedies, which the Internal Revenue Law establishes against such assessements. But even if the doctrine laid down by the *fiscal* were correct, says the opposing counsel, the Messrs. Guerra could not lose any right on account of non-compliance, inasmuch as the remedies referred to in the Revenue Law relate only to assessments and to valuation of property against which they make no objection. The taxpayers argue that the said remedies had no application to their case whatever, because in this proceeding they claim that the Revenue Law should not be imposed upon them, and that they are liable only to a distinct tax to establish which proposition is the object of their case presented to this tribunal.

Answering the *fiscal's* second proposition counsel for the tax payers contends that the principles of law relied on to support it have no foundation in the sound principles of reason and in exact justice; and further that the tax payers by their letter, addressed to the Treasurer on the 8th of May, 1901, before the Hollander Law took effect, made all the protest that was necessary on their part and the subsequent payments of the taxes demanded of them cannot be considered as voluntary.

In regard to the third point, which is an incidental question of costs, counsel for the taxpayers observes that the matter being so plain and the legal proposition so obvious, the trial court was perfectly right in making the application of Article 93 of the "Contentious-Administrative Law," placing the costs upon the litigant whom it considered, with

the most perfect legality, and the strictest justice, to be maintaining a position without justification.

Concerning the fourth point it is contended by counsel for the taxpayers that the application of Messrs. Guerra to the Spanish authorities, made under the law of the 3rd of June, 1868, for the reduction of their taxes, and the order issued by the provincial officers, granting the same constituted a contract, and that as such it is protected by that clause of the Constitution of the United States which provides that no state can pass any law impairing the obligation of contracts. (Art. 1 section 10 Cons. U. S.) In other words, that the law mentioned is irrepealable, and that the Revenue Act of the 31st of January, 1901, had no effect in modifying or abrogating this law.

The attorney for the taxpayers also claims for them protection under the Treaty of Paris, arguing that the exemption from taxation of his client's lands is a vested right, and as such must be considered as property of which they could not be deprived, under the terms of that treaty.

No Spanish authorities, save the statute known as the *Ley de Colonias Agríolas,* are quoted to sustain the position of the taxpayers. This law under which they claim the reduction in their taxes was promulgated by Queen Isabela II, on the 3d of June, 1868, and extended to Porto Rico in the year 1894; and the sections referred to in this case are 7th, 8th and 26th, which, together with the title of the law and other sections having application to the questions at issue, read as follows:

"Law of the 3d of June 1868.

"Redrafting the provisions of the law of the 8th of January and 23d of May, 1845, Royal Decree of the latter date, laws of the 24th of June, 1849, and 21st of November, 1855, 11th of July and 3d of August, 1866, in regard to the protection and encouragement of agriculture and of the rural population and declaring the said provisions to be repealed in all those parts which are in conflict with the present law.

"Sec. 7. The lands reclaimed by the drainage of lagoons, swamps and places covered with water shall be exempt from all taxes for a period of ten years from the day on which they shall be put under cultivation, as kitchen-gardens, meadows and vineyards, or shall be planted in cereals, vegetables or industrial roots or plants; for fifteen years if they shall be planted in fruit trees; and for twenty-five years if they shall be planted in olive trees, almonds, bread-fruit, mulberry and other similar trees.

"If houses shall be built on the reclaimed lands, more than a kilometer from a town or village, the houses and the lands pertaining thereto shall enjoy five years more of exemption, respectively, in each of the three cases of the previous paragraph.

"Sec. 8. The lands which from time immemorial shall have remained without useful employment, and thus, the cultivation of which shall have been interrupted for a space of fifteen consecutive years, shall only pay, upon being broken up and cultivated, the tax on real estate, which they shall have paid the previous year, for a period of ten years, from the day on which they shall be put under cultivation, as kitchen-gardens, or meadows, or be planted in cereals, vegetables or industrial roots or plants; for fifteen years, if they shall be cultivated as vineyards, or planted in fruit trees; and for twenty-five years if they shall be planted in olive trees, breadfruit, mulberry, or other similar trees.

"Sec. 22. The proprietors, who at present enjoy the advantages granted by the laws of the 8th of January and 23d of May, 1845, and the Royal Decree of the latter date, as well as by the laws of the 24th of June, 1849; 21st of November, 1855; 11th of July and 3d of August, 1866, or other legislative provisions, and shall build one or more houses on the respective rural estates shall enjoy five years more of non-increase of taxes on vineyards and irrigated lands; and of ten years on nurseries of almond trees, olive, breadfruit, mulberry, and similar trees, the same as on lands planted in timber trees; and the inhabitants of said houses shall, besides, have all the advantages that are granted by this law, the application of which shall be reckoned from the time when the enjoyment of the advantages referred to in the previous laws commenced.

"Sec. 23. The proceedings begun in conformity with the laws of colonies and of rural population, of the 21st of November, 1855, and the 11th of July, 1886, and the decision of which is pending, shall be dispatched, according to the will of those who have insti-

tuted the same, either in accordance with the provisions of the afore-said laws, or in accordance with those of the present law.

"Sec. 24. The proprietors of rural estates, who shall build on the same one or more houses or buildings, in accordance with the present law, shall be able to redeem the quitrents with which said lands may be encumbered in favor of the State, by paying the capitalized amount of the same, in twenty installments instead of those fixed by the laws in force.

"Sec. 25. All the advantages and powers, which by the present law are granted to the proprietors of rural estates and of industrial establishments, situated in the country, are extended to the lessees and colonies of the estates and of the factories.

"Sec. 26. The proprietors who wish to enjoy the benefits dispensed by this law, shall apply to the mayor of the municipal district in which the landed property or properties are located, with a petition addressed to the governor of the province, stating the location, area, and boundaries, condition, the products cultivated, if any, and the taxes paid at the time, for the lands which are the subject of the official proceedings.

"The mayor shall immediately direct that two members of the board of experts of the place ascertain the facts stated by the proprietor, by an ocular inspection of the lands, and make their report in writing. Within fifteen days after the presentation of the petition of the proprietor, and after having heard the opinion of the town council, the mayor shall forward said petition to the Governor, expressing his opinion and enclosing the report of the members of the board of experts, who have inspected the land, and the resolution of the town council.

"The Governor shall take action on the matter within the period of a month, and if he should fail to do so, it shall be understood that the petition of the proprietor has been granted.

"In case the resolution of the Governor should be negative, the proprietor concerned may oppose the same before the Ministry of Public Improvements, which shall decide the matter within sixty days after the presentation of the writing of the complaint. And in case this period should elapse without any resolution being adopted it shall be understood that the petition has been granted, and the proprietor who has made the complaint shall enter upon the full enjoyment of the benefits granted by this law, in accordance with his petition.                                                     "

"Sec. 27. The provisions contained in the law of the 8th of Jan-

uary, and 23d of May, 1845, the Royal Decree of the latter date, laws of the 24th of June, 1849, and 21st of November, 1885, 11th of July and 3d of August, 1886, and all other provisions whatever are repealed in so far as they may be in conflict with the present law.

"Sec. 28. The Government shall establish the necessary regulations for the application of this law."

The concession itself which the taxpayers claim to have been made in their favor by the Spanish Government does not appear to be copied in the record, but seems to have been proven by letters from the revenue officials to the *alcalde* within whose jurisdiction the lands lay, and read, when translated, as follows:

"1. Central Administration of Taxes and Revenues.—Porto Rico.— Number 1966.—Under this date I say to the Alcalde of Vega Baja the following: In view of the proceedings instituted by request of Mr. Arturo Guerra, in his own name and representing his father, Mr. Mauricio Guerra, requesting a reduction of the tax imposed by the council of that town, upon his property called 'Blandito,' in the territorial tax assessment for 1896-1897, on the ground that the benefits of the Law of Agricultural Colonies have been extended to the said real estate. Finding: That His Excellency the Governor General, by decree of the 18th of August of the year last past, has seen proper to order that the property of the Messrs. Guerra enjoy for ten years the exemption provided for by articles 7 and 8 of the Law of Agricultural Colonies. *Finding:* That the said council was advised of the aforementioned decree of His Excellency on the 18th of August of the present year, at which date the public had already been assessed for the payment of the territorial tax for this year. Concluding: That the said article 8 provides that the property coming under the concession referred to shall pay during the term of the same amount as the year before. And concluding: That the said exemption on the estate 'Blandito' was granted during the first quarter of 1896-1897; the Excellent Treasurer General has deemed proper to order that, in that quarter, the interested parties satisfy the amount fixed by the board of experts, and in the remaining three the tax corresponding to the 31 *pesos* fixed for the former fiscal year, which is the rate that should serve as a basis for the taxation of the said property during the term of the concession. Which I quote for

your information. May God preserve you for many years.—Porto Rico, 11th of May, 1897.—Alejandro Infiesta.—Señor Don Arturo Guerra.

"2. Central Administration of Taxes and Revenues, Porto Rico.— Under this date the following communication is directed to the Mayor of Vega Baja:

"Being informed of the request made by Arturo Guerra, representing his father, Mr. Mauricio Guerra, making claim against the council for the proportion fixed on the estate called 'Blandito,' in the territorial tax assessment for the year 1897-1898. Finding: That in the present assessment list the said estate is assessed at the rate of 51 pesos and 16 cents, the same as for the fiscal year 1896-1897. Finding: That on the 11th of May, 1897, the abolished Treasurer General reduced the said rate to 31 pesos, or the same rate as assessed in 1895-1896, on account of the estate 'Blandito' coming under the benefits provided for by the Law of Agricultural Colonies. Concluding: That in order to fix the rate which should be paid by the taxpayers, the former assessment list will be taken as a basis, which was not taken into consideration in the present case, notwithstanding the recognized exemption of the said estate; the illustrious Secretary of the Treasury, by virtue of a decision under date of yesterday, has seen proper to order that the said rate be reduced in the present assessment for the estate 'Blandito,' which difference must be proportionately distributed among the other taxpayers of that district, as the total amount to be collected is invariable, the assessors and the council being responsible in common for the collection, in accordance with the provisions of article 71 of the corresponding rules. Which I communicate to you for your information, etc. May God preserve you for many years.—Porto Rico, 11th of March, 1898. N. Daubón."

The first point presented by the appellant is properly preliminary and will be first considered. It may be regarded as fundamental as it goes to the jurisdiction of the district court in the "contentious-administrative" process. It clearly appears by a reference to the Revenue Law that an appeal is authorized from the decision of an assessor of the Board of Revision and Equalization composed of the Treasurer, the Secretary, the Commissioner of the Interior, and two other persons appointed by the Governor. This board is constituted "for the purpose of passing upon all claims made by

the taxpayers in respect to the assessment of their proper-ties.'' (Rev. Stat. P. R., sec. 308.)   It is further enacted that ''any person aggrieved by the assessor in relation to the valuation of his property may make written complaint thereof to said board.'' (Rev. Stat. P. R., sec. 309.)   And again the board is authorized ''to hear the appeal and deter-mine anew any questions arising before the board which re-late to the liability of the property to assessment, or to the amount thereof.'' (Rev. Stat. P. R., sec. 310.)   And again in the same section it is declared that ''said board shall have power to abate, lessen or increase the valuation made in any schedule returned to it, whether any complaint has been made in relation thereto or not, and to decide all other com-plaints in respect to the assessment of taxes and to correct all errors, as they may be brought to its attention.'' (Rev. Stat. P. R., sec. 310.)

The *fiscal,* following the opinion of the Acting Attorney-General, seems to have fallen into an error in regard to an appeal lying from a decision of the Board of Review and Equalization to the Executive Council, since the law says: ''The decision of the board in all matters coming before it shall be final.'' (Rev. Stat. P. R., sec. 310, p. 411.)

The claim of counsel for the taxpayers in regard to this point, referring to the defects in the Revenue Law, does not seem to us to be sound, since it was evidently the intention of the Legislature that the Board of Review and Equalization should have a general supervision over the levying of taxes, and, in the enactment of a revenue law, no special denial of the right of the taxpayer to take his complaint to the courts was necessary. The general repealing section fully covers this matter.

In regard to the construction of repealing law we need refer to only a very few authorities. The Supreme Court of Wisconsin in a well considered case says:

"A revenue law, like any other statute, may be repealed by implication. But there is always a presumption, more or less strong according to circumstances, that a statute is not intended to repeal a prior statute on the same subject unless it does so in express terms. Without a repealing clause the two may stand and have effect together, unless they are inconsistent; and in that case to the extent of the inconsistency the latter will repeal the earlier; but even then the two must be given effect so far as practicable. In the case of grants of power to tax made to municipal bodies, the presumption that it was not intended to modify or repeal these by subsequent general legislation is so strong as to be almost conclusive.

"Nor does the doctrine that statutes *in pari materia* are to be taken together and construed as one act affect the question. It is a rule of construction resorted to in case of doubt, and is never applicable where the statute is plain and unambiguous." (*State v. Cram,* 16 Wis., 343, citing Sedgwick on Statutory Law, 231.)

If further authorities are necessary they can be had in abundance and we will quote the following:

"It is not in accordance with settled rules of construction to ascribe to the law-making power an intention to establish conflicting and hostile systems upon the same subject, or to leave in force provisions of law by which the later will of the legislature may be thwarted and overthrown. Such a result would render legislation a useless and idle ceremony and subject the law to the reproach of uncertainty and unintelligibility." (*Lyddy* v. *Long Island City,* 10th N. E. Rep., 157.)

"It is a familiar canon of construction that a thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter, and a thing which is within the letter of a statute is not within the statute unless it be within the intention of the makers." (*Riggs* v. *Palmer,* 5 L. A. R., 340, and notes.)

There can then, in the light of these and all the authorities, be no doubt of the intention of the Insular Legislature to establish a new system of taxation and to repeal all other systems; and exemptions such as seemed proper being made

by the Revenue Law all other exemptions and reductions are recalled and abrogated, and if the power to do so existed, these exclusive privileges of the owners of ''Blandito'' were swept away with all others of a similar character.

In the same way the contention of counsel that the remedies provided for his clients before the Board of Revision and Equalization had no application must be denied, since the authority of the board is ample to adjust and determine all such questions.

The objection to the jurisdiction of the trial court on the ground that the administrative recourse had not been exhausted is entitled to great weight. The Revenue Law authorizes an appeal to the Board of Review from the Treasurer's rulings in tax matters, and the parties should have resorted to that remedy before filing their suit. (See ''Contentious-Administrative'' procedure articles 1, 2, and 4, Political Code articles 308 to 313 inclusive.) There is a procedure in some of the States, in school matters, similar to the ''contentious-administrative'' practice in use in Porto Rico. It is held, in one of the States, that no suit can be brought against trustees, or other school authorities until the parties first apply to the State school board; and the pleadings must show that this has been done. The legal status upon which the court may act is not established until some right has been denied the party by the highest administrative officer or board having jurisdiction of the subject matter. It cannot be said that the right is denied by the Government when no proper application has been made to it, in order that its officer may pass on the right, and have an opportunity to recognize or deny it.

It is true that jurisdiction over the person will be presumed, when nothing appears to the contrary in the record, but jurisdiction over the subject-matter is never presumed, and consent of parties cannot give jurisdiction in such cases. The Law of ''Contentious-Administrative'' procedure, article

46, provides for the filing of dilatory exceptions before making answer and among the exceptions which can be presented mentions that to the jurisdiction; and article 48 provides that exceptions which are not filed before the answer may be filed as peremtory exceptions with the answer, and the court is required to pass on them when rendering final judgment. There is nothing in those articles that militates against the proposition that the court is without jurisdiction when the administrative remedy has not been resorted to; on the contrary the language of the fifth paragraph of article 46 expressly states that the court is incompetent when the claim is not of the nature and condition required by the fifth title of the law. Article 1 is very clear in stating when the "contentious-administrative" procedure may be resorted to; and requires as an indispensable requisite to the court's jurisdiction that the required legal status shall have been previously produced; and by the terms of article 2 of the same law that status cannot exist until the administrative recourse has been fully appealed to.

If the points here presented are not jurisdictional, they at least go far toward the merits of the action, and are so material that they may possibly affect its foundation. The fact of the plaintiff's having resorted to his administrative remedy is absolutely necessary to form a predicate upon which to base a decree, and when this basis has not been laid so far as the record shows, it is difficult to see how the judgment can be maintained in force.

We will now glance at the second preliminary proposition advanced by the appellant, that the taxpayers are cut off from their application to the courts for relief in this case because they have paid the taxes assessed on the lands and cannot recover money voluntarily paid into the Treasury of the Island. To this the appellees reply that although they have paid the tax regularly their application made to the Treasurer on the 8th of May, 1901, was in the nature of a protest, made

before the law went into effect, and must be considered as such.

Inasmuch as the exemption claimed is for ten years, and does not expire for a year òr two yet to come, there must be some taxes remaining unpaid, and as to these at least the taxpayers have a right to object in a proper manner. But as the petition seeks to recover back the sums claimed to have been paid in excess of $18.60 per annum, we may examine the force necessary to be given to the proposition laid before us by the attorney for the Island.

In the discussion the eminent counsel representing the taxpayers in substance says:

"Reference is made by counsel for the Government to the views of a so-called eminent legal writer on the matter of voluntary payments. These propositions lack logical soundness and are not consonant with exact justice."

Let us hear the text-book speak for itself. In regard to this question of voluntary payments Judge Cooley, in his work on taxation, states the law as follows:

"That a tax voluntarily paid cannot be recovered back the authorities are generally agreed. And it is immaterial in such a case that the tax has been illegally laid, or even that the law under which it was laid was unconstitutional. The principle is an ancient· one in the common law, and is of general application. Every man is supposed to know the law, and if he voluntarily makes a payment which the law would not compel him to make, he cannot afterwards· assign his ignorance of the law as the reason why the State should furnish him with legal remedies to recover it back. Especially is this the case when the officer receiving the money, who is chargeable with. no more knowledge of the law than the party making payment, is · not put on his guard by any warning or protest, and the money is﹐ paid over to the use of the public in apparent acquiescence in the justice of the exaction.

"Mistake of fact can scarcely exist in such a case except in connection with negligence; as the illegalities which render such a demand a nullity must appear from the records, and the taxpayer is

just as much bound to inform himself what the records show, or do not show, as are the public authorities. The rule of law is a rule of sound public policy also; it is a rule of quiet as well as of good faith, and precludes the courts being occupied in undoing the arrangements of parties which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and liabilities.

"All payments are supposed to be voluntary until the contrary is made to appear. Nor is the mere fact that a tax is paid unwillingly, or with complaint, of any legal importance, but there must be in the case some degree of compulsion to which the taxpayer submits at the time, but with notificaiton of some sort equivalent to reservation of rights. It has been said in one case that 'taxes illegally recovered may always be recovered back if the collector understands from the payer that the tax is regarded as illegal and that suit will be instituted to compel the refunding,' but it has been repeatedly held that a mere protest, when payment was not made to save arrest or the seizure or sale of goods, or in submission to process that might immediately have been enforced, would not relieve the payment of its presumed voluntary character. In some cases it is held that a payment made only to release lands from the lien of a tax, or to prevent a sale of lands, or to redeem lands from a sale actually made, will not be held a payment under compulsion, and the party paying cannot reclaim it; but this is not universally assented to; and it seems reasonable that the rule should be restricted to cases in which if sale were made, fatal defects would appear on the face of the proceedings. A party ought not to be exposed to any more risks of loss in relieving his lands of an apparent cloud upon title than in protecting his goods against an illegal sale.

"When a voluntary payment is spoken of, the qualifying word is not used in its ordinary sense, and many payments are held to be voluntary which are made unwillingly and only as a choice of evils or of risks. Thus, a payment has been held to be voluntary which the owner made to save the property from being sold, as he supposed, when the collector was actually assuming to proceed to sale, but with an authority void on its face, and without possession or control of the property. A like ruling has been made when the officer threatened to sell property for a tax not then delinquent, having at the time no power to carry out his threat. So where a court without authority made an order for the payment of a tax, and payment was made accordingly, the party under such circum-

stances being under no legal compulsion—the payment was held voluntary. So where one of the days fixed for the sale of his property for the illegal tax proposed to make payment on the next day if the sale should be postponed, and postponement was had and payment made as proposed, this was held a voluntary payment. And it has been said in some cases, that when it is sought to recover back a payment as having been made under compulsion, it should be made to appear that payment was made to release either person or property from the power of the officer. And this may be said to express the general sense of the authorities.

"Statutes in some States have changed the rule somewhat and have allowed a recovery in all cases of illegal tax, provided that at the time of payment formal protest was made as the statutes prescribe. In respect to such statutes it is only necessary to say that a party relying upon them must be careful to bring his case within their provisions." (Cooley on Taxation, pp. 809, 810, 811, 812 and 813.)

In so far as the protest and the doctrine laid down by Cooley is concerned, say the distinguished counsel, representing the appellees herein, it is very doubtful, in the sound principles of reason and according to the strictest justice, whether it could have any application to the present case. This text writer, says the counsel, maintains that there is no right to reclaim from the State the return of money which has been paid in without protest, and from this the *fiscal* jumps to the conclusion that it cannot be maintained that the Messrs. Guerra have any right to reclaim taxes paid, but that in some manner the exaction of this tax was legal and that it ought to continue to be collected. But, continues their advocate, the Messrs. Guerra protested against the illegal collection which was being made upon them of those taxes, as is proven by the first writing which they addressed to the Treasurer of Porto Rico, against the legality of the said exaction long before the date at which the tax was collectible, and consequently the protest which the *fiscal* failed to observe, as a reality is as evident as the existence of this suit. Such is substantially the position taken by counsel for the taxpayers.

In our opinion the law as laid down by Judge Cooley correctly settles the question that, in so far as the recovery of any moneys already paid into the Treasury is concerned, the taxpayers have not taken the proper measures for their own protection. The payments. made by them must be considered as voluntary. The taxpayers were under no sort of duress either as to their persons or their property. They should have waited before making payment until a sale of their property was threatened when they, to prevent such a sale, could have made payment of the taxes under protest, or have sought for an injunction preventing a sale for the taxes claimed to be illegal, and all the matters which are brought to issue in this suit could have been there decided. When money has been inadvertently paid to the Treasury, under a mistaken claim of right, voluntarily and without protest, resort must be had to the Legislature to secure a repayment, and not to the courts, who have thus lost jurisdiction over the subject-matter.

As to the third point presented by the *fiscal* we need only say that in the view taken of this case the discussion in regard to costs is not material. If it were necessary to consider the ,question, the contention that in no event should costs be adjudged against the Government in such a case as this must be sustained. The 93d article of the ''Contentious-Administrative'' Law cannot be held to warrant it.

This brings us to the fourth and last proposition made by counsel for the Insular Government. Notwithstanding any views expressed on the preliminary questions presented herein we will examine the main proposition as minutely as its importance demands.

It is not necessary to discuss the great question formerly mooted whether or not the Constitution of the United States entire, or the subsidiary one as to whether the clause in the 10th section of the first article thereof which provides that ''no State shall pass any law impairing the obligations of

contracts," is in force in Porto Rico. For the purposes of this decision it may be considered that the taxpayer is entitled to all the benefits which could be derived from that clause, the same as if it were in force in Porto Rico. Let us consider the case on this basis.

But counsel for the appellees claims for his clients the protection of the Treaty of Paris, maintaining that this exemption from taxation, and reduction in the amount thereof, is property, or a right or rights belonging to the peaceful possession of property, within the terms of Article VIII of that treaty. In order more clearly to understand the proposition advanced by counsel, we will quote the first two paragraphs of the article, which read as follows:

"In conformity with the provisions of Articles I, II and III of this treatly, *Spain relinquishes in Cuba* and *cedes in Porto Rico* and other islands in the West Indies, in the Island of Guam and in the Philippine Archipelago, *all* the buildings, wharves, barracks, forts, structures, public highways and other *immovable property* which, in conformity with law, *belong to the public domain,* and as such belong to the Crown of Spain.

"And it is hereby declared that the *relinquishment* or *cession,* as the case may be, to which the preceding paragraph refers, *cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds,* of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or *of private individuals,* of whatever nationality such individuals may be."

This claim of protection under the Treaty of Paris may as well be disposed of here and now as elsewhere and at another time. If the exemption from taxation is a vested right in the appellees under the Spanish statute called the Law of Agricultural Colonies, it is a right of property and either in accordance with or regardless of the treaty should be protected. (See *Vryan* v. *Kennett,* 113 U. S., 192; *Soulard*

v. *United States,* 29 U. S., 511; *Strother* v. *Lucas,* 37 U. S., 435, 438; *Head Money cases,* 112 U. S., 598, 599.)

Article VIII of this treaty has reference only to "immovable property which belongs to the Crown of Spain," and the cession thereof cannot impair the rights of private individuals. From a careful reading of the two sections quoted this plainly appears to be their meaning, and if such is a proper construction this article can have no reference to the lands involved in this suit, nor to the exemption from taxation, entire or partial, which is claimed herein.

But there is no need to appeal to the Treaty for protection of vested rights. These are protected under the Constitution and laws of the United States with or without a treaty to that effect. Courts of justice never knowingly infringe vested rights in any civilized country and the Treaty of Paris in the section referred to is merely declaratory of these principles. (See *Fletcher* v. *Peck,* 10 U. S. [6 Cranch], 132 *et seq.*) Then the case may be considered, not only in accordance with the treaty and the National Constitution, but with due regard to the universal principles of justice which forbid the deprivation of any citizen of his vested rights.

Whatever rights the appellees may have had under the laws of the former Government should be recognized under the present, and our courts should regard the *status* of the lands as unchanged by the cession of the Island to the American Government.

The very core of the question then is: Had the exemption of a part and the reduction of the remainder of the lands, in regard to taxation, become fixed upon the real property, so as to be regarded as a vested right, arising out of a contract, in such a manner as not to be affected by subsequent legislation?

We may observe at the outset that the matter of the taxation of lands in Porto Rico and the recognition of exemptions and reductions made or claimed to have been made, whether

they are deemed to be temporary or permanent must be governed by the American laws, the sovereignty of the Island being vested in the American Government, but before entering fully upon the discussion of the case in the light of American jurisprudence we may glance at the Spanish statutes.

A reference to the title will show that the Spanish law of the 3d of June, 1868, on which the appellees rely as the basis of their supposed contract, repealed and modified several other prior laws, of an entirely similar nature, in regard to the protection and encouragement of agriculture. It would appear from this fact in itself that the law under which protection was claimed was not regarded in Spain as irrepealable, and that the exemption from taxation under that law was in no way regarded as having the sanctity of a contract.

The taxpayers rely in this proceeding upon two decisions made by the Supreme Court of the United States to sustain their proposition that the reduction and exemption claimed by them from the effect of the general tax laws is an irrepealable contract. Reference is made to the opinions expressed by Mr. Justice Davis in the cases of *Home of the Friendless* v. *Rouse,* and *Washington University* v. *Rouse,* in (8 Wall.) 75 U. S., pages 435-439. Those opinions, following the case of *Dartmouth College* v. *Woodward,* (4 Wheaton,) 17 U. S., 625, and other cases in line with that celebrated decision, maintained the proposition that a charter granted by a state to a charitable or educational institution, and for the purpose of enabling the incorporators "more fully and effectually to accomplish their laudable purpose," exempting the property of such corporation from taxation, forms a contract, based on a sufficient consideration, and thus secures the protection of that clause of section 10 of Article I of the Constitution of the United States, forbidding any State to pass a law impairing the obligation of contracts.

The exemption so given in a charter granted by the State

cannot afterwards be withdrawn by a subsequent legislature owing to the force of the clause in the National Constitution mentioned. This proposition is recognized as the settled law in the United States, notwithstanding the very able dissenting opinions which have from time to time been filed by some of the justices of the Supreme Court limiting or calling in question the doctrine which thus curtails the taxing power. Mr. Chief Justice Chase and Mr. Justice Field join Mr. Justice Miller, in the cases cited from (8 Wall.) 75 U. S., in holding that no legislature can by such a contract deprive the State forever of the power of taxation; since such action might result in the destruction of the Government by entirely surrendering the taxing power absolutely necessary to its maintenance.

Giving these opinions all the force which can be claimed for them, they do not support the position taken by the taxpayers in this case, unless the plaintiffs having no charter, can show that they have a contract, based on a valid and sufficient consideration, to support the exemption, or reduction in taxation, claimed as applicable to their sugar plantation called "Blandito."

Concerning this position taken by the counsel for the taxpayers a quotation may be made from a case covering similar circumstances. It is a case decided by the Supreme Court of the United States and arose in Pennsylvania.

A law of the Legislature passed in 1833 had exempted the property of a hospital from taxation for an indefinite term, and eighteen years afterwards this law was repealed. Although it was claimed to be a contract, the Supreme Court says:

"The plaintiffs claim that the exemption conceded by the act of 1833 is perpetual, and that the act itself is in effect a contract. This concession of the Legislature was spontaneous, and no service or duty, or other remunerative condition, was imposed on the corporation. It belongs to the class of laws denominated *privilegia fa-*

*vorabilia..* It attached only to such real property as belonged to the corporation, and while it remained as its property, but is not a necessary implication from these facts that the concession is perpetual, or was designed to continue during the corporate existence.

"Such an interpretation is not to be favored, as the power of taxation is necessary to the existence of the State, and must be exerted according to the varying conditions of the Commonwealth. The act of 1833 belongs to a class of statutes in which the narrowest meaning is to be taken, which will fairly carry out the intent of the legislature. All laws, all political institutions, are dispositions for the future, and their professed object is to afford a permanent and steady security to the interest of society. Bentham says: 'That all laws may be said to be framed with a view to perpetuity; but perpetual is not synonymous with irrevocable; and the principles on which all laws ought to be, and the greater part of them have been, established, is that of defeasable perpetuity—a perpetuity defeasible by an alteration of the circumstances and reasons on which the law is founded.

"It is in the nature of such a privilege as the act of 1833 confers that it exists *bene placitum*, and may be revoked at the pleasure of the sovereign." (*Rector, etc., of Christ Church* v. *Philedalphia County*, 65 U. S. [24 Howard], 302-303.

The Supreme Court of the United States again in a later case emphasizes this doctrine in the following clear and concise language:

"It has been held many times in this court that a State may make a valid contract that a corporation or its property within its territory shall be exempt from taxation, or shall be subject to a limited and specified taxation. (Referring to many cases.)

"The court has, however, in the most emphatic terms, and on every occasion, declared that the language in which the surrender is made must be clear and unmistakable. The covenant or enactment must distinctly express that there shall be no other or further liability to taxation. A State cannot strip itself of this most essential power by doubtful words. It cannot, by ambiguous language, be deprived of this highest attribute of sovereignty. This principle is distinctly laid down in each of the cases referred to. It has never been departed from." (*Erie Railway Company* v. *Pennsylvania*, 88 U. S., 498 and 499.)

Counsel for the taxpayers also himself relies upon and cites the Darmouth College Case, decided in the year 1819 and reported in 17th U. S. (4th Wheaton), 628. In our view this case has no application to the present, further than to illustrate the force of the constitutional provision above referred to. The main question in that famous case was whether or not a charter granted to a college situated in New Hampshire, by the British Government fifty years previously, should be respected by the Government of the State afterwards erected among the colonies; and it was decided that such a charter constituted a contract and was entitled to the protection of the constitutional provision, and that therefore no State could pass a law changing such a charter in its essential features without impairing the obligation of the contract entered into between the former Government and the college long years before, which was forbidden by the Federal Constitution.

It may perhaps be unnecessary to discuss the long line of decisions which have followed the Dartmouth College Case, nor the effect which those cases have upon legislation and jurisprudence in the United States. The famous opinions of the great Chief Justice and his able associates, Washington and Story, were probably more far-reaching than he and his associates, who concurred in the decision at that time, anticipated. But, whatever may be thought of this notable case in the light of later history, it is the law of the land, and as such must be respected. Let us follow the current of authorities as it carries this question along from time to time.

Another case decided by the Supreme Court of the United States in 1830, in which Chief Justice Marshall again wrote the opinion of the court, is *Providence Bank* v. *Billings,* 29 U. S. (4 Pet.), 358. From that opinion may be cited the following paragraph:

"The claim of the Providence Bank is certainly of the first impression. The power of taxing moneyed corporations has been frequently exercised, and has never before, so far as is known, been resisted. Its novelty, however, furnishes no conclusive argument against it. That the taxing power is of vital importance; that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such power is never to be presumed. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which a deliberate purpose of the State to abandon it does not appear." (*Providence Bank* v. *Billings*, 29 U. S. [4 Pet.], 558-560.)

This case was followed in 1853 by a decision of the same high tribunal, in which Chief Justice Taney delivered the opinion of the court. It is reported in 57 U. S. (16 How.), and a paragraph on page 428 may be quoted:

"It will be admitted on all hands that with the exceptions of the powers surrendered by the Constitution of the United States, the people of the several States are absolutely and unconditionally sovereign within their respective territories. It follows that they may impose what taxes they think proper upon persons or things within their dominion, and may apportion them according to their discretion and judgment. They may, if they deem it advisable to do so, exempt certain descriptions of property from taxation and lay the burden of supporting the government elsewhere. And they may do this in the ordinary forms of legislation or by contract, as may seem best to the people of the State. There is nothing in the Constitution of the United States to forbid it, nor any authority given to this court to question the right of a State to bind itself by such contracts, whenever it may think proper to make them." (*Ohio Life Insurance and Trust Company* v. *Debolt*, 57 U. S. [16 How.], 428.)

But again in the same case, on page 434 of the same volume, the same illustrious jurist used the following language:

"The rule of obstruction, in cases of this kind, has been well settled by this court. The grant of privileges and exemptions to a corporation are strictly construed against the corporation, and in favor of the public. Nothing passes but what is granted in clear and explicit terms. And neither the right of taxation nor any other power of sovereignty which the community have an interest in preserving undiminished will be held by the court to be surrendered unless the intention of the surrender is manifested by words too plain to be mistaken. This is the rule laid down in the case of *Billings* v. *The Providence Bank* and reaffirmed in the case of the *Charles River Bridge Company.*" (*Ohio Life Insurance and Trust Company v. Debolt*, 57 U. S. [16 How.], 434.)

The Chief Justice continuing, in the same opinion on the next page, says:

"And if individuals choose to accept a charter in which the words used are susceptible of different meanings, or might have been considered by the representatives of the State as words of legislation only, and subject to future revision and repeal, and not words of contract, the parties who accept it have no just right to call upon this court to exercise its high power over a State upon doubtful or ambiguous words, nor upon any supposed equitable construction, or inferences made from other provisions in the act of incorporation. If there are equitable considerations in their favor the application should be made to the State and not to this court. If they came here to claim an exemption from their equal share of the public burdens, or any peculiar exemption or privilege, they must be shown by plain and unequivocal language." (*Ohio Life Insurance and Trust Company* v. *Debolt*, 57 U. S. [16 How.], 435.)

Some years later, in 1862, a case arose in the State of Wisconsin which involved the power of a State to tax certain property within its limits, and the Supreme Court of the United States, speaking through Mr. Justice Swayne, in making its decision, announced the following propositions:

"The Act of 1854 authorized the borrowing of money, the issuing of bonds, and the levying of a tax upon all the property in the city for the purposes specified. The imposition, modification and

removal of taxes, and the exemption of property from such burdens is an ordinary exercise of the power of a State sovereignty. There is no pledge, express or implied, that this power should not thereafter be exercised.

"Admitting that the State *could* enter into such an engagement there is no evidence that it *did*. This fact should never be assumed unless the language used be too clear to admit of doubt. If the agreement existed, the complainant is not in a position to make the question. There is no allegation that the tax levied is insufficient. We hear of no complaint from the bondholders. They are not before us. It does not belong to the complainant vicariously to enforce their contract and protect their rights." (*Gilman* v. *City of Sheboygan*, 67 U. S. [Blk.], 513.)

In 1871 a case came from the Supreme Court of Michigan to the Supreme Court of the United States involving questions very similar to the case at bar. The State of Michigan, by a law regularly passed by the Legislature had offered a bounty of ten cents for every bushel of salt manufactured for a certain number of years. This was held not to be a contract in such a sense that it could not be repealed. The Supreme Court in discussing it held that such a law was only a bounty law, and merely regulative of the internal economy of the State, and that such general encouragement was held out to all persons indiscriminately to engage in any particular manufacture or trade. In concluding the opinion of the Supreme Court, rendered by Mr. Justice Bradley, the following language is used:

"In short, the law does not, in our judgment, belong to that class of laws which can be denominated contracts, except so far as they have been actually executed and complied with. There is no stipulation, express or implied, that it shall not be repealed. General encouragement, held out to all persons indiscriminately, to engage in a particular trade or manufacture, whether such encouragement be in the shape of bounties or drawbacks, or other advantage, are always under the legislative control and may be discontinued at any time." (*Salt Company* v. *East Saginaw*, 80 U. S. [13 Wall.], 397.)

Again in the year 1874 in the case of *Tucker* v. *Ferguson*, reported in 89 U. S. (22 Wall.), beginning on page 527, the Supreme Court reaffirmed this doctrine. Mr. Justice Swayne delivered a very lengthy and able opinion, from which the following paragraphs are quoted:

"The company, so far as the matter of right is concerned, were upon a footing with all other alienees of the United States. The imposition of taxes can in no just sense be said to be a diminution of the value of the lands. If Congress had thought so, they would have forbidden it. Liability to taxation is an incident to all real estate. Exemption is an exception. When claimed, to be effectual, it must be clearly made out. * * *

"The provision of the thirty-seventh section of the Act of 1871, exempting the lands specified from local taxation until three years from the 1st of April, 1871, which period has not elapsed, was not a contract. There was no consideration. The company was required to do nothing and did nothing in return. As between individuals the stipulation would belong to the category of *nude pacts*. It has no higher character because one of the parties was a State, the other a corporation, and it was put in the form of a statute. It was the promise of a gratuity spontaneously made, which might be kept, changed or recalled at pleasure. * * *

"The taxing power is vital to the functions of government. It helps to sustain the social compact and to give it efficacy. It is intended to promote the general welfare. It reaches the interest of every member of the community. It may be restrained by contract in special cases for the public good, where such contracts are not forbidden. But the contract must be shown to exist. There is no presumption in its favor. Every reasonable doubt should be resolved against it. Where it exists it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly require. It is in derogation of public right and narrows a trust created for the good of all." (*Tucker* v. *Ferguson*, 89 U. S. [22 Wall.], 573, 574, 575.)

The doctrine announced and the decision rendered in the case of *Tucker* v. *Ferguson* (22 Wall., 527) was reaffirmed in a subsequent Wisconsin case in October, 1876. This was the case of *West Wisconsin Railroad Company* v. *Super-*

*visors of Trempealeau County,* 93 U. S., 597 *et seq.* Mr. Justice Swayne, delivering the opinion of the court in this case also and referring to the case above cited, and quoting from it, says:

"We hold here, as we held there, that the exemptions in question were gratuities offered by the State, without any element of a contract. There was no assurance or intimation that they were intended to be irrevocable, or that the laws in question should not be at all times subject to modification or repeal in like manner as other legislation. If a different intent had existed, it would doubtless have been clearly manifested by the language employed. It would not have been left to encounter the possible results of such a struggle and conflict as have occurred in this litigation. * * * .

"The State chose to continue the gratuity for a time and then withdrew it. The exemption given by both acts was abrogated a year before the bonds of the last series were issued and before the first term of exemption expired or the second began. The State did what it had an unqualified right to do. In such cases, a reasonable doubt is fatal to the claim. *Prima facie* every presumption is against it. It is only when the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported. (*Providence Bank* v. *Billings,* 4 Pet., 561; *Christ's Church* v. *Philadelphia,* 24 How., 302; *Gilman* v. *Sheboygan,* 2 Black, 513; *Herrick* v. *Randolph,* 13 Vt., 531; *Easton Bank* v. *Commonwealth,* 10 Penn. St., 450; *People* v. *Ropper,* 35 N. Y., 629.)

"We hold the conclusion we have announced to be the law of this case. With its ethics we have nothing to do. That subject is not open to our consideration."

This brings us, in the current of authorities, to the case of *Welch* v. *Cook,* 97 U. S., 541, which is the one mainly relied on by the *fiscal* in his argument before this court. In this case it appears that the District of Columbia, which at that time had a legislative assembly, passed an act, providing that all property, real and personal, which might thereafter be actually employed for manufacturing purposes, should be exempt from taxation for a period of ten years. Afterwards the Legislative Assembly of the District of Columbia

was abolished by the Congress of the United States, and a tax law was enacted imposing certain taxes on all real estate in the said district except that belonging to the United States and to the District of Columbia, and that used for educational and charitable purposes, thus repealing the law exempting property employed for manufacturing purposes. Welch and others, who had invested their money in manufacturing enterprises within said district, brought a suit to enjoin the collection of taxes, claiming the exemption under the act of the legislature. The case finally reached the Supreme Court of the United States, and Mr. Justice Hunt delivered the opinion of the court. The whole opinion is worthy of a careful reading and consideration; however, we will quote but two paragraphs:

"Under these circumstances, and prefaced as was the act by the recital that this levy was made to support the Government and maintain its credit, it is apparent that the Act of Congress was intended to create a separate system, and to be independent of the action of all preceding bodies. Other and different exemptions have before existed; no settled system had been adopted. The Act of the Legislative Assembly of 1871, fixing the taxes for that year, gave more than forty exemptions in great detail, covering an entire page in the statute book (p. 26); that of the same body, fixing the taxes for 1872, exempted only personages, churches, the ground on which they stood, and burial grounds (p. 109). Here it is declared that all real estate shall be taxed except that therein specifically exempted. We think that the system in regard to taxation, including what should be taxed, the rates and the exemptions from taxation, was intended to be an independent one, to abolish existing impositions or exemptions, and to form a complete system of itself.

"Nor are we able to see that this action involves a breach of faith towards the owner of the manufacturing property. Conceding, as the plaintiff must and does, that the exemption of this property was of the bounty of the Legislature, he knew when he accepted it that it was liable to be revoked whenever either the local legislature or Congress should be of the opinion that the public interest demanded such action. He could not but realize that an assessment of three per cent upon the value of property in Washington or two and a half

per cent upon that in Georgetown, created a heavy burden. Others felt it as it did, and it is reasonable to suppose that Congress considered it a duty to lighten the burden of taxation by increasing the subjects of it as far as justice required." (*Welch* v. *Cook*, 97 U. S., 544-545.)

Although it is not a practice which ought to be generally followed to make long quotations from text writers in the opinions of courts of appeal, yet in this case, as the discussion has taken a wide range and there does not seem to be among members of the local bar great familiarity with the elementary principles governing this case as understood on the Continent, a discussion from a textbook universally recognized as one of the best of its class may not be inappropriate.

That eminent jurist, Thomas M. Cooley, who for so many years adorned the Supreme Bench in Michigan, in his great work on taxation, so often quoted with approval by the highest courts on the American Continent, summing up the consensus of judicial opinion as expressed by the courts and adding and intermingling his own wisdom therewith, says:

"*The taxing power is an incident to sovereignty.*—The power of taxation is an incident of sovereignty, and is possessed by the Government without being expressly conferred by the people. It is a legislative power; and when the people, by their constitutions create a department of government upon which they confer the power to make laws, the power of taxation is conferred as part of the more general power. Even a wrongful government, if it be for the time a government *de facto*, maintaining its authority and enforcing obedience to its laws, may exercise the power of taxation, and the power, so far as it has been completely enforced, must be recognized as lawful. But the overthrow of the *de facto* government defeats the power; and the rightful government will not thereafter aid in enforcing the uncollected levies.

"Everything to which the legislative power extends may be the subject of taxation, whether it be person or property, or posses-

sion, franchise or privilege, or occupation or right. Nothing but express constitutional limitation upon legislative authority can exclude anything to which the authority extends from the grasp of the taxing power, if the legislature in its discretion shall at any time select it for revenue purposes. And not only is the power unlimited in its reach as to subjects, but in its very nature it acknowledges no limits and may be carried to any extent which the government may find expedient.

"It may therefore be employed again and again upon the same subjects, event to the extent of exhaustion and destruction, and may thus become in its exercise a power to destroy. If the power be threatened with abuse, security must be found in the responsibility of the legislature which imposes the tax to the constituency who are to pay it. The judiciary can afford no redress against oppressive taxation so long as the legislature, in imposing it, shall keep within the limits of legislative authority and violate no express provision of the Constitution. The necessity for imposing it addresses itself to the legislative discretion, and it is or may be an urgent necessity which will admit of no property or other conflicting right in the citizen while it remains unsatisfied." (Cooley on Taxation, pp. 4, 5 and 6.)

"*Restriction or Relinquishment of the Power by Contract.*—In some cases the State legislature is found to have pledged the State, in definite and formal manner, that on some particular subject of taxation the State should refrain, either wholly or for some definite period, from levying any taxes whatever, or should levy them only to a certain extent. Such pledges are commonly impolitic and unwise, and it is always among the possibilities that, if sustained, they might be carried to the extreme of crippling the sovereign power of the State to perform its accustomed functions. There has always, therefore, been a strong protest against the doctrine that such pledges could constitutionally be made, the protestants insisting that no legislature is competent to limit the power of its successor, but must transmit to those to come after it the complete power which it received from its predecessor. But the Federal Supreme Court in an early case, in which the facts were that a State had exchanged lands with an Indian tribe and stipulated by legislative act that those conveyed to the Indians should not thereafter be subject to any tax, decided that this stipulation was binding upon the State as a contract; that the State could not impose taxes in contravention of the stipulation, and that the exemption was available on behalf of those who subsequently by

legislative permission became purchasers from the Indians. The contract derived its character of the inviolability from the clause of the Constitution of the United States inhibiting the States from passing any law impairing the obligation of contracts, a clause which applies to the contracts of a State equally with those of individuals.

"The pledge, however, in order to constitute a contract, must have the elements of a contract, and the vital elements are consent and consideration. Consent to the exemption on the part of the State is never by itself sufficient, but there must be something received by the State for the relinquishment or something surrendered on the other side which can be deemed a legal equivalent. In the case first referred to the consideration was manifest, the State was bargaining away its lands, and was presenting the exemption from taxation as an inducement for better terms on the other side.

"So if the legislature by law, in order to secure the establishment of a charitable institution, charter a corporation, and in the charter declare that its property shall be exempt from taxation, and individuals, in reliance thereon, invest their means to secure the accomplishment of the object of the law, a consideration for the state promise is thus made out. The case would be still plainer if the State received a bonus for the grant of a franchise, stipulating in the grant to give exemption from taxation, or if it made the grant to a corporation on a surrender by it of valuable rights.

"The contract of exemption may either be perpetual or limited to a definite period, and it may be for the taxes generally or only for some portion of them, or it may be a limitation of the tax within some specified bounds. The same principles apply in each case; where a certain sum is specified, or a certain percentage upon valuation, or upon receipts or acquisitions in any form, this is in the nature of a commutation of taxes, the State agreeing that the sum named is, under the circumstances, a fair equivalent for what the customary taxes would be, or the fair proportion which the person bargained with ought to pay, and the power thus to commute, though liable to abuse, is undoubted. And this rule applies when a bonus is paid for complete future exemption, to the same extent and on the same reasons as when the commutation is for an annual payment.

"It is perfectly well settled, however, that an exemption granted for motives of state policy merely, and when the State and the citizen do not meet on a basis of bargain and consideration, is to be deemed expressive only of the present will of the State on the subject, and the law granting it, like laws in general, is subject to modification or re-

peal, in the legislative discretion, and it is immaterial that while it continued in force parties have acted in reliance upon it. It is also well settled that the contract must be clearly made. The power to tax being essential to the very existence of the State, there can be no presumption that it has been either abandoned or restricted, and whoever claims that it has been, should be able to show by clear words that an intent is expressed to do so, and that consideration existed therefor. And when thus the contract is made out, it cannot be extended by implication beyond the fair import of its terms. As has been said by the Federal Supreme Court, if on any fair construction of the legislation there is reasonable doubt whether the contract is made out, this doubt must be solved in favor of the State. In other words, the language used must be of such a character as, fairly interpreted, leaves no room for controversy.

"By repeated decisions of the Federal Supreme Court it has been authoritatively and conclusively determined that the character of a private corporation is to be regarded as a contract between the corporators on the one hand and the State on the other, and that whatever stipulations are contained therein which are intended for the benefits of the corporators, and operate as an inducement to them to accept the charter, are promises by the State based on valid and sufficient consideration and not subject to recall except with the assent of the corporation itself. Stipulations respecting taxation come within the principle, and are therefore irrepealable, and not subject to change at the mere will of the State, to the prejudice of those on whose behalf they are made. But the right to amend or repeal may be reserved in the charter, and when it is reserved it is a part of the contract, and may be exercised by the State at pleasure, unless conditions are imposed in respect to its exercise, in which case the conditions must be observed. To avoid the force of the principle that a corporate charter is a contract which oftentimes operates in some unexpected manner, and perhaps unjustly to the public at large, the people of some of the States have made express provision by their constitutions that all charters of private incorporation granted by the legislature shall be subject to amendment or repeal, at the legislative will. A provision of this nature is a limitation upon the power of the legislature in granting charters, and while it cannot affect any that are in existence when it takes effect, it attaches the quality of modification and repealability to any afterwards granted, and all who accept them do so with full notice of the fact. The charters are still contracts, but contracts with a reserved right on the part of the State to amend or ter-

minate them.   The rule would be the same if the charter were granted
while a general law of. the State was in force which declared that all
grants of the kind should be subject to the legislative power of altera-
tion and repeal, for the grantees would accept their franchises with
notice of and qualified by such a declaration.

"Contracts of a State, like the contracts of individuals, may be
modified to any extent, subject to constitutional provisions, if any,
having a bearing upon the right, by the mutual consent of the parties
thereto, which in the case of a charter of private incorporation would
be the State on the one side and the corporators on the other.   The
State consents to the modification when it adopts legislation which
has that effect, and the corporation when it accepts such legislation.

"A different rule prevails in the case of charters of municipal in-
corporation.   These are not contracts, but regulations of government,
and if they contain provisions respecting taxation, such provisions, like
everything else in the charter, are subject to change, as the legislative
judgment may change respecting questions of policy and expediency,
or as changing circumstances may seem to require."   (Cooley on Taxa-
tion, pp. 66, 67, 68, 69, 70, 71, 72, 73.)

It will be seen from a careful review of these extracts
from the opinions of the Supreme·Court of the United States
and from the summary contained in the textbook quoted,
that the crucial test, running all through .this line of deci-
sions and applicable to the case before this court, is whether
or not a contract exists between the Government and the
taxpayer.   If there is a contract, under the clause quoted
from the 10th section of Article I of the Constitution of the
United States the taxation is illegal and should be re-
strained.   If there is no contract, the Revenue Law is in full
force, and the taxes should be imposed and collected.   We
are of the opinion that a contract, to exist between the State
and one of its citizens, whether it be a natural person or a
corporation, the same as ˙between two individuals, requires .
a consideration moving from one party to the other, other-
wise it is what is denominated in one of the opinions quoted,
a *nude pact.*   In other words, unless the taxpayer is required
to do something and has done something for the benefit of the

State, he cannot claim that the exemption or reduction in his taxes granted to him constitutes a contract and for that reason is irrepealable.

A consideration may be defined to be any benefit derived or agreed to be conferred on one party to a contract from or by the other party, to which previously the beneficiary was not entitled; or on the other hand any prejudice suffered or conceded by one party to the contract other than such as he was previously bound to suffer; the same acting as an inducement on the one side or the other for the formation of the contract. Has the Island received any benefit or the taxpayers suffered any prejudice on account of the concession claimed under the Spanish law? Have not all the benefits been on the part of those taking the concessions? Have not all the moneys expended been returned to them many fold? Even the increased salubrity of the neighborhood is enjoyed solely by them and their tenants. Why should their neighbors be required to contribute a greater sum to the support of the Government in order to lessen the burden on these sugar planters? They have done so for several years, but has not the time arrived when such inequalities in the burdens of Government should cease?

In the case at bar nothing whatever indicates, and nothing appears from the record to show that the Messrs. Guerra did anything or suffered any loss or inconvenience by virtue of which they could ask the Government to reduce their taxes or to exempt them from taxation. It is quite plain that the Government derived no benefit whatever from any act of theirs. All the benefit derived from their acts, in regard to the estate known as "Blandito" upon which the exemption is claimed, was applied to their own property. It is true, the property may have been reclaimed from the marshes; uncultivated lands may have been put in cultivation, and other investments and improvements may have been made,

but in return for that the record shows that the health of their families and their tenants and employees may have been rendered more secure; and that they have annually reaped large crops of sugar, and that the Insular Government did not participate in those benefits and profits, to the extent of a single *centavo*.

The further fact that this privilege which they obtained from the Spanish Government in 1896 was left undisturbed by the American Government, and was not withdrawn until the passage of the Revenue Law by the Insular Government on the 31st of January, 1901, does not strengthen the position which is sought to be maintained. Although the Government having control of the Island had the right to act at any time it was not bound to act until it seemed proper, in the opinion of its legislative authorities, so to do. The delay in the repeal was for the benefit of the appellees, and they cannot complain of it or claim anything under it except the incidental benefits naturally arising from temporary reductions and exemptions. There is nothing whatever in this case which is analogous to an estoppel, so as to bind the Government or its officers to respect or perpetuate the temporary privilege enjoyed by the appellees.

It is useless to prolong this discussion which already exceeds the limits ordinarily allowed to cases of this nature and importance. A consideration being wanting in the transaction between the Government and the taxpayer, there could be no valid contract, and therefore, the exemption law enacted by the Queen of Spain in 1868, must be regarded as repealed by the Revenue Law of the Legislative Assembly of Porto Rico, of the 31st of January, 1901. For this and the other reasons stated herein the judgment of the district court should be reversed, and a judgment here rendered in favor of the Insular Government permitting the Treasurer to collect the taxes imposed, and denying the relief sought by the

appellees, imposing upon them all the costs of these proceedings, both in this court and the court below.

*Reversed.*

Chief Justice Quiñones and Justices ·Hernández and Figueras concurred.

Mr. Justice Wolf did not sit at the hearing of this case.